Argued and submitted January 21, reversed and remanded with instructions
April 27, 1983

MENDEZ et al,
*Appellants,*
*v.*
ROSENBAUM,
*Respondent.*

(121,375; CA A24662)

662 P2d 751

George Eder, Salem, argued the cause and filed the brief for appellants.

Deborah J. Dealy-Browning, Monmouth, argued the cause and filed the brief for respondent.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

NEWMAN, J.

## NEWMAN, J.

Plaintiffs sued defendant for specific performance, claiming that defendant was obligated to satisfy her purchase money mortgage on their home. Defendant counterclaimed for foreclosure of the mortgage. The court dismissed plaintiffs' amended complaint and awarded defendant a decree of foreclosure.[1] Plaintiffs appeal.

Plaintiffs assign as errors the trial court's order (1) striking the allegation of the amended complaint that plaintiffs had "deposited with Pioneer National Title Insurance Company, Independence, Oregon" the unpaid balance of the mortgage,[2] (2) granting defendant's motion to dismiss plaintiffs' amended complaint for specific performance and (3) granting defendant a decree of foreclosure. Because the court erred in granting defendant a decree of foreclosure, we reverse.

In May, 1978, plaintiffs purchased their home in Independence from Citizens Valley Bank, trustee for defendant. Plaintiffs paid $11,200 cash and gave a note and purchase money mortgage to that bank as trustee, for the $26,550 balance. The note provided for monthly payments of $250, including interest, on the 10th day of each month, with the balance due on June 1, 1980. In June, 1978, the trustee assigned the note and mortgage to defendant.

In August, 1978, plaintiffs and defendants established a collection escrow at the First National Bank of Oregon (the bank) in Salem. Defendant deposited the loan papers in escrow with a satisfaction of the mortgage that the bank was to deliver to plaintiffs on payment of the note. Paragraph 2 of the escrow instructions to the bank provided:

"You are irrevocably directed to hold all of said documents * * * until this escrow shall terminate:

---

[1] There is no showing in the record that there has been a judicial sale under the decree.

[2] The second sentence of paragraph 4 of plaintiffs' amended complaint provides:

"On July 10, 1980, plaintiffs deposited with Pioneer National Title Company, Independence, Oregon, the sum of $25,842.69 (which included interest due to that date in the sum of $208.28)."

" * * * (b) by the demand of the mortgagee when any scheduled payment shall not have been paid to you within 30 days after payment is due, in which event you shall make such disposition of said documents as the mortgagee shall direct * * *."

Paragraph 4 of escrow instructions also provided:

"You shall accept any payments tendered to you to apply upon said promissory note, whether due or not due or past due; provided, however, that you shall not accept any payment after documents have been surrendered to the mortgagee by reason of default in payment continuing more than 30 days after the maturity thereof."

When plaintiffs purchased the home, it was encumbered by two prior mortgages from defendant to the Oregon Department of Veterans' Affairs (VA). Defendant's deed to plaintiffs and plaintiffs' mortgage to defendant provided that, when the note from plaintiffs was paid on June 1, 1980, defendant would pay off the VA mortgages. Plaintiffs' note to defendant provided that plaintiffs reserved the right on June 1, 1980, to require defendant to pay the VA mortgages. The escrow instruction to the bank made no reference to the VA mortgages.

Plaintiffs made all the regular monthly payments through May, 1980. The balance of over $25,500 was due on June 1, 1980.

On March 7, 1980, plaintiff Amador Mendez wrote to defendant that "I need to know some information from you regarding the two years you had financed the house from me, and those two years are almost going to expire." He inquired whether "there was a possibility of you getting a veteran's loan and it be transferred to me. I would appreciate it if it could be done." On March 13, 1980, defendant replied: "In regard to the possibility of transferring a veteran's loan to another party, that is impossible * * *. I am sorry — that I cannot do that." Defendant's letter then stated:

"The payment in full is supposed to be the first of June. And I am hoping you can come up with the payment at that time. If the home means a great deal to you, you should be able to find someone that will loan you the money - * * * but I would rather keep it for myself. Because

if you don't feel like you can afford the place - I can, and as property is going up everywhere - it is to my advantage to keep it.

"But I will not let it go for the price you were given. It is worth more * * *."

On April 7, 1980, Amador Mendez again wrote to defendant, acknowledged her letter and stated:

"I do not wish to give up the house. I am aware of the due [date] of the contract in June. But as of this time I do not have the opportunity receive a loan. Because of a uprising [sic] problem in the wood industry I have been recently laid off my job. The only chance at this time for me to keep this property is in you. If it were possible for an extension in our contact. * * * I would be able to keep making your monthly payments as usual. The only hope I have lies in your hands."

On April 14, 1980, defendant wrote to the bank that plaintiffs could not make the final payment the first of June and "I plan on foreclosing * * *."

On April 21, 1980, defendant again wrote Amador Mendez, "I am sorry I cannot help - but I have to look out for my*self*. No one to do it for me. And you play safe and look out for yourself." (Defendant's emphasis.) On May 16, 1980, the bank wrote defendant that plaintiffs had applied for a loan to pay the balance, that the loan was being processed through the Federal Housing Administration (FHA), that it would take a month to six weeks' to process the loan, and "since your contract states final payment is due on or before June 1, 1980, we need your approval of an extension of this date to allow time for processing the loan." On June 10, 1980, defendant replied to the bank, "I do *not wish to extend* the payment." (Defendant's emphasis.) Defendant's letter also stated that "The contract Reads [sic] to be on the first of June - with 30 days' grace."

Plaintiffs sent defendant a payment for June 1, 1980, of $250. Defendant wrote to plaintiffs on June 17, 1980:

"Herein I am enclosing a check for $250 - I am refusing any further payments - on the ·place.

"You defaulted in the full payment the first of June.

"And I am not to receive any more payments on same.

"I will return each and every payment. You have 30 days to move out and you still have 13 days."

"I expect to move in on the 1st of July with no trouble to me."

The bank approved plaintiffs' loan application on June 19, 1980, subject to certain conditions, including making certain repairs. It sent a copy of the letter of approval to defendant. The repairs were completed and approved by FHA on June 26. No issue has been raised respecting fulfillment of the other conditions.

The bank had decided that Pioneer National Title Insurance Company (PNTI) in Independence should handle closing of the refinancing loan. On Tuesday, July 2, 1980, more than 30 days after June 1, 1980, plaintiffs' attorney wrote to defendant that plaintiffs

"* * * are prepared to pay the full amount that you have coming on the mortgage. This amount due you will be available for payment by July 10 (I have been assured of this by the First National Bank). * * * I hope you will cooperate in getting this matter resolved promptly without a lawsuit * * *. I hope that I will hear from you or your attorney promptly. Everything is all set to pay you all that you are entitled to receive."

A postscript stated "The money will be disbursed to you from Pioneer National Insurance Co. in Independence. A young lady by the name of Karen will be handling the matter. Her phone number is 838-5541." On that day plaintiffs' attorney also made a telephone call to defendant and told her the same thing.

Prior to July 2, 1980, defendant did not arrange for the VA to deposit satisfactions with PNTI or to execute any necessary closing instructions that PNTI required. After defendant received the July 2 letter from plaintiffs' attorney, an acquaintance of defendant offered to take her to PNTI in Independence to sign papers. She refused. Defendant thought if she went to PNTI she would receive the balance. She testified at trial that she wanted the house back. She did not want the money.

On July 7, 1980, the bank sent PNTI draft loan documents to close the refinancing loan, including a payoff letter from the VA giving the amounts necessary to pay off

the VA mortgages. The refinancing loan would have provided adequate funds for that purpose. PNTI never received instructions from defendant to pay the proceeds of the refinancing loan to satisfy the VA mortgages, and, therefore, was not ready to close. The bank was ready to close and forward funds to PNTI on July 7, but it was unwilling to do so until PNTI was ready to close.

The refinancing loan never closed. On July 19, 1980, the bank's commitment expired, and at the time of trial plaintiffs had no loan commitment. They have not paid defendant the balance of the note. The refinancing loan did not close between July 7, and July 19, 1980, only because defendant did not give instructions to PNTI to disburse proceeds of the refinancing loan to the VA.

Plaintiffs argue that the note and mortgage between the parties did not contain a provision that "time was of the essence." The May 10, 1980, note, however, provided that the balance was due June 1, 1980. It was in defendant's power to make performance by that date essential, and in the correspondence quoted above, she exercised that power. 3A Corbin, Contracts, § 723 (1960). Plaintiffs acknowledged in their correspondence in early March that they were aware of the need to pay the balance in full on June 1, 1980.

Plaintiffs claim that defendant gave plaintiffs an extension beyond July 1, because defendant did not terminate the escrow under paragraphs 2(b) and 4(a) of the escrow instructions and direct the bank as to the disposition of the documents. Defendant interpreted paragraph 2(b) of the escrow instructions to provide an additional 30-day period so that final payment could be made July 1, 1980, rather than June 1, 1980. To this extent the escrow instructions "modified" the note, but in view of defendant's explicit letters to plaintiffs and the bank refusing any extension beyond July 1, 1980, defendant cannot be held to have extended payment past July 1 by not also giving the bank notification to terminate the escrow or return the documents to her.[3]

---

[3] *See also Hays v. Hug,* 243 Or 175, 177-78, 412 P2d 373 (1966), in which the court construed a provision in escrow instructions similar to paragraph 4 here as

Nonetheless, plaintiffs had an equitable right of redemption to pay the mortgage debt after default until a foreclosure decree. Osborne, Mortgages, § 302 (1970). Although plaintiffs were in default on July 2, 1980, defendant's deliberate inactivity obstructed plaintiffs' opportunity to exercise that right and rescue themselves from default. In *Sellwood v. Gray & DeLashmutt,* 11 Or 534, 538-39, 5 P 196 (1884), the court stated:

> " * * * [The] equity of redemption is the right to redeem from the mortgage—to pay off the mortgage debt—until this right is barred by a decree of foreclosure; but until this right is barred, his estate, in law or in equity, is just the same after as it was before default. It is a right, though, of which the law takes no cognizance, and is enforceable only in equity, and has nothing to do with our statute of redemptions. * * * This is a valuable right, and exists not only in the mortgagor himself, but in every other person who has an interest in, or legal or equitable lien upon, the mortgaged premises, and includes judgment creditors, all of whom may insist upon a redemption of the mortgage. * * * Nor can one, against his consent, be deprived of this right without due process of law. To bar his right of redemption, he must be made a party to the foreclosure, or the proceedings, as to him, will be a nullity. * * *" (Citations omitted.)

*See also Portland Mtg. Co. v. Creditors Prot. Ass'n,* 199 Or 432, 262 P2d 918 (1953).

Defendant was not entitled to obstruct plaintiffs' effort to exercise their equitable right of redemption and pay off the mortgage debt prior to the decree of foreclosure. *See* Tiffany, Law of Real Property, § 1381 (1939). Defendant was responsible for satisfying the VA mortgages concurrently with plaintiffs' discharge of the balance of the note. That responsibility included cooperation in closing the refinancing loan by executing instructions which PNTI required to disburse proceeds to the VA. Plaintiffs could not close the refinancing loan without those instructions. They were unable to tender the necessary funds only because of defendant's deliberate inactivity. Defendant knew that her cooperation was needed to enable plaintiffs

---

"obviously for the benefit of the bank and not intended to modify the time of the essence clause of the contract which required that all payments be made promptly when due."

to close the loan and intentionally declined to give it. She refused in early July to go to the title company to execute the necessary instructions, because she did not want the plaintiffs to pay off the mortgage debt and wanted the house back.

Although the court did not err in striking plaintiffs' allegation in the amended complaint that they had deposited the balance with PNTI, tender of the amount due, under the circumstances, should have been excused.

> "Under the rules applicable to tender generally, the making of a tender may be excused where it is prevented by the act of the party to whom it is due, as where the mortgagee is absent and cannot be found, or has failed or refused to permit the redemptioner to make the tender unless the statute does not require personal tender; or where the mortgagee through his act keeps the redemptioner in ignorance of the amount necessary to redeem; or where the mortgagee has hindered plaintiff from raising the necessary money * * *." 59 CJS Mortgages § 850, p 1645. (Footnotes omitted.)

*See also Wilson v. Crimmins,* 172 Or 616, 622, 143 P2d 665 (1943). Because defendant obstructed plaintiffs' exercise of their equitable right of redemption, it was error to grant defendant a decree of foreclosure. Accordingly, we reverse and remand.

On remand the court shall enter an order allowing plaintiffs a reasonable time within which to exercise their equitable right of redemption, ordering defendant to cooperate with plaintiffs in that exercise and providing that a decree of foreclosure shall be entered if plaintiffs do not redeem within the set time.[4] The decree of foreclosure, if entered, shall provide that the judicial sale is subject to plaintiffs' statutory right of redemption and that defendant cooperate with plaintiffs in the exercise of that statutory right.

In view of the foregoing, we need not consider further plaintiffs' assignment of error respecting dismissal of their amended complaint for specific performance.

---

[4] Because we reverse the decree of foreclosure, plaintiffs' equitable right of redemption continues to exist.

Reversed and remanded for proceedings not inconsistent with this opinion.